# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| ESTATE OF CHERYL BEAUDRY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:07-cv-00842 |
| | ) |
| TELECHECK SERVICES, INC., et al., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

After nearly thirteen years of litigation, there is still a question about whether Cheryl Beaudry ("Plaintiff" or "Beaudry")[1] has standing to bring this putative class action against TeleCheck Services, Inc., TeleCheck International, Inc., and First Data Corporation (collectively, "TeleCheck"[2] or "Defendants") for their alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*. This issue returns to the Court after it previously denied without prejudice Defendants' Motion for Summary Judgment for Lack of Standing pending the appeal in Huff v. TeleCheck Servs., Inc., No. 3:14-cv-1832, because Huff involved "[t]he same attorneys, same Defendants, and . . . the same issue" and was "likely to have a significant impact on the legal analysis in this case[.]" (Doc. No. 257 at 1.) Now that the Sixth Circuit has issued its opinion in Huff v. TeleCheck Servs., Inc., 923 F.3d 458 (6th Cir. 2019), Defendants have filed a

---

[1] Ms. Beaudry unfortunately passed away during the pendency of this action (Doc. No. 200), and the Estate of Cheryl Beaudry was substituted as the party plaintiff (Doc. No. 225). For ease of reference, however, the Court will refer to Beaudry in the present tense for purposes of resolving the pending motion.

[2] Because the parties collectively refer to Defendants as "TeleCheck" in their briefing, the Court will follow suit. By doing so, the Court makes no determination about whether the TeleCheck companies operate as First Data Corporation's alter ego, as is alleged in the First Amended Complaint (see Doc. No. 90 ¶ 37).

Renewed Motion for Summary Judgment for Lack of Standing (Doc. No. 260), which has been fully briefed by the parties. (See Doc. Nos. 261, 268, 274.) For the following reasons, Defendants' motion will be granted.

I.  BACKGROUND AND UNDISPUTED FACTS[3]

TeleCheck provides check-verification services to businesses in Tennessee. (Doc. No. 90 ¶¶ 34, 45.) When a retail consumer presents a check as a method of payment, a merchant will acquire an "identifier" (primarily a driver's license number) from the consumer and send it to TeleCheck for a recommendation about whether the merchant should accept or decline the check. (Id. ¶ 24.) TeleCheck processes the identifier through its internal "predictive risk-scoring system," which considers hundreds of variables related to consumers' check writing information, and then returns a single-digit recommendation "Code" to the merchant. (Doc. No. 269 ¶¶ 3, 6.) As relevant here, a Code 1 recommends that the merchant accept the check, a Code 3 recommends that the merchant decline the check because the identifier did not score high enough in TeleCheck's risk-scoring system, and a Code 4 recommends that the merchant decline the check not because of risk, but because there is some negative history associated with the identifier, such as an unpaid debt, bounced check, or closed bank account. (Id. ¶¶ 4–5, 7–8.)

In February 2002, Tennessee changed its driver's license numbering system from an eight-digit to a nine-digit format. (Doc. No. 90 ¶ 47.) To transition existing license holders to the new system, the state merely added a leading zero to their old eight-digit numbers. (Doc. No. 275 ¶ 5.) For example, if a driver had a license number "23456789," her new nine-digit number would become "023456789." (Doc. No. 90 ¶ 47.)

---

[3] The Court draws the facts in this section from the undisputed portions of the parties' statements of facts (Doc. Nos. 269, 275), the depositions and declarations submitted in connection with the summary judgment briefing, and portions of the First Amended Complaint (Doc. No. 90) that are not contradicted by the evidence in the record.

2

TeleCheck did not take measures to treat consumers' old and new Tennessee driver's license numbers the same, leading many consumers who presented nine-digit licenses at the point of sale to incorrectly appear as first-time check writers in TeleCheck's system. (Id. ¶ 60.) Claiming that this error negatively affected her and "hundreds of thousands, if not millions, of persons" in Tennessee, (id. ¶ 72), Beaudry filed this lawsuit contending that TeleCheck's failure to implement reasonable procedures to associate eight-digit and corresponding nine-digit Tennessee driver's license numbers violated the FCRA, specifically 15 U.S.C. § 1681e(b). TeleCheck eventually[4] responded with the instant motion for summary judgment, contending that Beaudry lacks standing to bring this action because she did not suffer a concrete injury necessary to confer federal jurisdiction. (Doc. No. 260.)

## II. LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case. Id. (citation and internal quotation marks omitted).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus.

---

[4] This case's "long and tortured" procedural history, which spanned more than a decade and involved a trip to the Sixth Circuit, is summarized in the Court's September 29, 2016 Memorandum Opinion and need not be repeated here. (See Doc. No. 224 at 4–5.)

Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

### III. ANALYSIS

Article III of the Constitution provides that the "judicial Power" extends only to "Cases" and "Controversies," U.S. Const. art. III, § 2, an element of which is standing. Spokeo, Inc. v. Robins, 136 S.Ct. 1540, 1547 (2016). "Although the term 'standing' does not appear in Article III, [the] standing doctrine is 'rooted in the traditional understanding of a case or controversy' and limits 'the category of litigants empowered to maintain a lawsuit in federal court[.]'" Buchholz v. Meyer Njus Tanick, PA, 946 F.3d 855, 861 (6th Cir. 2020) (quoting Spokeo, 136 S.Ct. at 1547). If no plaintiff has standing, the Court lacks subject-matter jurisdiction to hear the case. See Lyshe v. Levy, 854 F.3d 855, 857 (6th Cir. 2017).

To establish Article III standing, a plaintiff must show she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, 136 S.Ct. at 1547 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)). The plaintiff has the burden of establishing all three elements and, at the summary judgment stage, "cannot rely on allegations alone but must set forth evidence demonstrating [her] standing." Huff, 923 F.3d at 462; see also Exec. Transp. Sys. LLC v. Louisville Reg'l Airport Auth., 678 F. Supp. 2d 498, 505 (W.D. Ky. 2010) ("On summary judgment, proof of standing is subject to the same burden of proof and standard of review as any

4

other critical fact: Plaintiffs must be able to show at least the existence of a genuine issue of material fact as to the elements of standing if their claims are to survive.").

Defendants argue that they are entitled to summary judgment because Beaudry has not met her burden to establish the "[f]irst and foremost" element of standing, injury in fact. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103 (1998). According to the Sixth Circuit's recent decision in Huff, there are three potential ways Beaudry could establish an injury in fact as a result of TeleCheck's alleged FCRA violation: (1) "the statutory violation created an injury in fact as applied to [Beaudry] because it actually injured [her] when the violation led, say, to a check decline"; (2) "the statutory violation did not injure [her] in any traditional way, but the risk of injury was so imminent that it satisfies Article III"; or (3) "the statutory violation did not create an injury in any traditional sense, but Congress had authority to establish the injury in view of its identification of meaningful risks of harm in this area." Huff, 923 F.3d at 463. As explained more fully below, the Court agrees with TeleCheck and does not find that Beaudry suffered an Article III injury under any of the three theories articulated in Huff.

    A.    Actual Injury

Beaudry argues that although there is no direct evidence in Defendants' document production showing that TeleCheck issued a decline recommendation for any transaction involving her nine-digit Tennessee driver's license number, the Court nevertheless should infer she suffered an actual injury (i.e. a check decline) because (1) there are gaps in TeleCheck's records, (2) she testified about check declines in the past, and (3) there is evidence that other consumers experienced "phantom declines." (Id. at 3, 17–18.) After carefully considering Beaudry's arguments, the Court does not find that it would be reasonable or permissible to make her requested inference because there is not enough evidence from which such an inference can be made. See Jones v. Potter, 488 F.3d 397, 409 (6th Cir. 2007) (quoting Matsushita, 475 U.S. at 587–88) (noting

5

that at the summary judgment stage, "[a]ll inferences must be drawn in the nonmoving party's favor unless they are 'unreasonable' or 'impermissible'").

Regarding Beaudry's argument that the record is incomplete, it is undisputed that Defendants' production is missing transactional data for the entire calendar year of 2004, February 2006, and August 11–20, 2006. (Doc. No. 275 ¶ 20.) As an initial matter, there is no evidence that Beaudry presented her nine-digit driver's license to a TeleCheck merchant before December 27, 2005, making the transactional data from 2004 irrelevant to whether TeleCheck's alleged FCRA violation caused an actual injury. (See id. ¶ 24; see also Doc. No. 248 (Ahles Dep.) at 127:5–128:9.) As for the missing data from 2006, without evidence that Defendants destroyed data or acted with a culpable state of mind, which is not alleged, Beaudry is not entitled to an adverse inference that the missing data contains a Code 3 check decline for Beaudry. Beaven v. U.S. Dep't of Justice, 622 F.3d 540, 553 (6th Cir. 2010); see also Vaughn v. Konecranes, Inc., 642 F. App'x 568, 578 (6th Cir. 2016).

Moreover, Beaudry's deposition testimony about past declines in Searcy v. Equable Ascent Fin. LLC, Case No. 1:11-cv-05990 (N.D. Ill), which was a different lawsuit against different defendants, is not enough to support an actual injury in this case. (Doc. No. 268 at 17–18.) Specifically, Beaudry testified in 2009 that merchants had declined her checks "[l]ess than five" times in the preceding five years, but she could not substantiate those claims by providing any additional information about where or when those specific declines occurred.[5] (Doc. No. 244-3 at 5–6.) Such vague testimony would not permit a jury to reasonably infer that *TeleCheck* issued a

---

[5] Beaudry also testified that she had several checks returned for having insufficient funds in her bank account. (Doc. No. 244-3 at 4–7.) As Defendants explain, if a bank returns a check for insufficient funds, "[t]hat would have caused a Code 4 decline, not a Code 3 decline, making such declines irrelevant to this lawsuit." (Doc. No. 261 at 16 n.9.)

6

Code 3 decline recommendation for Beaudry, let alone that the decline was caused by TeleCheck's failure to associate the check-writing history of her two driver's license numbers. See Lewis v. Philip Morris Inc., 355 F.3d 515, 533 (6th Cir. 2004) (internal quotation marks and citation omitted) ("In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [her] favor on more than mere speculation, conjecture, or fantasy.").

Nor could a jury reasonably find that Beaudry suffered actual harm based on her "phantom declines" theory. Citing to a TeleCheck training manual section titled "Phantom Declines,"[6] Beaudry claims she is entitled to an inference that she suffered an unrecorded Code 3 decline because there are "numerous instances" where "consumers reported check declines by TeleCheck but TeleCheck had no record of the transactions in its system." (Doc. No. 268 at 17 (citing Doc. No. 249).) The Court is unwilling to make this leap of faith, particularly given Defendants' response that "[p]hantom declines do not mean, as [Beaudry] suggests, that TeleCheck may decline consumers and have no record of that decline in its system." (Doc. No. 274 at 6 n.5.) Instead, Defendants continue, the "term is used in a TeleCheck training manual to instruct call center representatives as to how to search for certain declines in TeleCheck's system." (Id.) Because there is no evidence that TeleCheck failed to record any check declines in its system, a jury could not reasonably conclude that Beaudry suffered an unrecorded Code 3 decline.

In sum, there is not enough evidence for a jury to find that TeleCheck's alleged FCRA violation actually injured Beaudry in the form of a check decline. Huff, 923 F.3d at 463.

---

[6] The TeleCheck training manual states that "[i]f a Checkwriter contacts you in reference to obtaining a decline and you are unable to locate the transaction in the Record of Call in the Summary Screen, this is considered a Phantom Decline." (Doc. No. 249 at 2.)

7

B.     Risk of Imminent Injury

Beaudry alternatively argues that she has standing because she was exposed to a material risk of a check decline when she incorrectly appeared as a first-time check writer in TeleCheck's internal system. (Doc. No. 268 at 6); see also Huff, 923 F.3d at 463. Even where a plaintiff cannot show actual harm, as is the case here, "[a] material risk of harm . . . may establish standing." Huff at 463 (citing Spokeo, 136 S.Ct. at 1549). However, the "threatened injury must be *certainly impending* to constitute injury in fact." Id. (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013)). "[A]llegations of *possible* future injury are not sufficient." Clapper, 568 U.S. at 409 (quoting Whitmore v. Arkansas, 495 U.S. 149, 158 (1990)) (internal quotation marks omitted).

Beaudry's risk-of-harm theory of standing is far too speculative to satisfy Article III's injury-in-fact requirement. It is undisputed that "[a]ppearing as a first-time check writer may be considered a negative factor by TeleCheck's predictive scoring logic when it determines whether to send the merchant a Code 3 decline recommendation." (Doc. No. 275 ¶ 9.) But check writing history is only one out of hundreds of variables TeleCheck considers in any given transaction, meaning first-time check writers do not automatically receive a Code 3 decline recommendation. (Doc. No. 269 at ¶ 6; see also Doc. No. 248 at 130:14–18.) This likely explains why Beaudry received a check approval when a merchant entered her new driver's license into TeleCheck's system on December 27, 2005, even though she incorrectly appeared as a first-time check writer. It is important to remember that "[t]he question . . . is not whether [Beaudry] faces some risk of a check decline in general but what additional risk of harm stems from TeleCheck's" inaccurate information. Huff, 923 F.3d at 463–64 (citing Macy v. GC Servs. Ltd., 897 F.3d 747, 758 (6th Cir.

8

2018)). Here, the evidence before the Court reveals that Beaudry's incorrect checking history presented no material risk that her "first" check would be declined.[7]

It logically follows that after Beaudry received one check approval associated with her nine-digit license number, she developed a positive check-writing history that made it even more likely that TeleCheck would approve her future checks. As Beaudry admits, "'[l]ife-to-date' count, or LTD count, is a variable that TeleCheck's system considers in deciding whether to issue an approval or decline code; generally speaking, the higher the LTD count, the more positive this factor becomes in the process to issue an approval code." (Doc. No. 268 at 4; see also Doc. No. 275 at 4.) And it is undisputed that "Defendants' 'system' is supposed to result in those consumers having more good checks in TeleCheck's databases having a greater likelihood of TeleCheck issuing an approval code to merchants on subsequent checks. . . ." (Doc. No. 275 at ¶ 7.) Thus, if TeleCheck issued an approval code when Beaudry had an LTD count of *zero*, then it would be unreasonable to infer that she faced an *imminent* risk of a subsequent Code 3 decline based on her lack of check-writing history. And lest there be any doubt that this risk was negligible, it would have been impossible for Beaudry to receive a Code 3 decline recommendation after TeleCheck gave her "preferred status" in 2010.[8] (Doc. No. 269 at ¶¶ 9–10.)

---

[7] Because Beaudry argues that TeleCheck's records are incomplete and missing transactions, she admits only that "based on the limited transactional history produced" by TeleCheck, "her nine-digit license first appeared in a transaction in TeleCheck's system on December 27, 2005." (Doc. No. 269 at ¶ 2.) The Court does not find this potential factual dispute to be material, however, because regardless of whether Beaudry may have presented her nine-digit license before December 27, 2005, "she was viewed as a 'first-time checkwriter' when TeleCheck processed the transaction" on that date. (Doc. No. 275 at ¶ 24.)

[8] Beaudry argues that by giving her preferred status, TeleCheck implicitly conceded that she faced an imminent risk of a check decline. (Doc. No. 268 at 14, 19.) TeleCheck responds that giving Beaudry preferred status was a "business decision . . . to ensure a litigious plaintiff did not suffer an adverse action that would undoubtedly lead to additional litigation." (Doc. No. 274 at 4.) Although there may be a dispute of fact about why TeleCheck gave Beaudry preferred status, it

9

To show that her risk of harm was not "hypothetical," Beaudry relies on her counsel's declaration stating that "approximately 143,749 people had one or more checks declined by TeleCheck's system using a nine-digit Tennessee driver license number." (Doc. No. 268 at 13 (citing Doc. No. 247 at ¶¶ 5–8)). This data fails to create a dispute of material fact for several reasons. First, "1,400,965 individuals had at least one transaction processed under both their eight-digit and nine-digit Tennessee license number," meaning that only 10% of relevant consumers who used a nine-digit license number suffered any form of a check decline. (See Doc. No. 247 at 2.) Second, Beaudry has not provided any evidence about whether those 10% of consumers received risk-based Code 3 declines, as opposed to Code 4 declines for having insufficient funds or unpaid debt. Third, even if the Court were to infer that some of those consumers received Code 3 declines, there is no evidence suggesting that those declines were caused by inaccurate check-writing histories. Last, even if some consumers suffered a Code 3 decline because of TeleCheck's alleged FCRA violation, Beaudry's argument would still fail because she has not shown that she was personally at risk of being injured. See Macy, 897 F.3d at 752–53 (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 40 n.20 (1976)) (noting that "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent").

Based on the evidence before the Court, no reasonable jury could conclude that Beaudry suffered a check decline *because* TeleCheck failed to link consumers' eight-digit and nine-digit driver's license numbers. See id. at 758 (risk of harm must be traceable to the procedural violation).

---

would be unreasonable to infer that Beaudry faced a certainly impending risk of harm on this basis alone.

Accordingly, Beaudry has not shown that TeleCheck's alleged FCRA violation exposed her to a material risk of a tangible injury.

### C. Intangible Injury

The Court next considers Beaudry's argument that TeleCheck's alleged FCRA violation, alone, created an intangible injury in fact sufficient to confer standing. (Doc. No. 268 at 12.) Enter Spokeo and "[t]he persisting obscurity of doctrine in [the] area" of Congress's authority to create actionable intangible injuries. Macy, 897 F.3d at 754 n.3 (quoting 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3531.13 (3d ed. 2017)).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is '*concrete* and particularized'[9] and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 136 S.Ct. at 1548 (quoting Lujan, 504 U.S. at 560) (emphasis added). Concreteness refers to a harm that is "real, and not abstract." Id. (citation and internal quotation marks omitted). Both tangible and intangible injuries (such as stifling free speech or free exercise of religion) can be concrete. Id. at 1549 (collecting cases). Congress has broad power to identify and define intangible injuries by statute that would not otherwise be actionable in federal court, Lujan, 504 U.S. at 578, but its authority is limited by Article III's requirement that there be some concrete injury even in the context of a statutory violation, Spokeo, 136 S.Ct. at 1549. See also Lyshe, 854 F.3d at 858 (emphasizing that Congress's power to create intangible injuries "does not eliminate the requirement that a plaintiff actually suffer harm that is concrete"). In other words, there is no "anything-hurts-so-long-as-Congress-says-it-hurts theory of Article III injury." Hagy v. Demers & Adams, 882 F.3d 616, 622 (6th Cir. 2018).

---

[9] Beaudry clearly satisfies the particularization requirement because any inaccuracies regarding her own check writing history would affect her in a personal and individual way. Spokeo, 136 S.Ct. at 1548 (collecting cases).

11

The Supreme Court in Spokeo addressed the issue of when a statutory violation (i.e. an intangible injury) alone is sufficient to establish a concrete injury in fact. The Sixth Circuit has interpreted Spokeo's holding as follows:

> Spokeo categorized statutory violations as falling into two broad categories: (1) where the violation of a procedural right granted by statute is sufficient in and of itself to constitute concrete injury in fact because Congress conferred the procedural right to protect a plaintiff's concrete interests and the procedural violation presents a material risk of real harm to that concrete interest; and (2) where there is a "bare" procedural violation that does not meet this standard, in which case a plaintiff must allege "*additional* harm beyond the one Congress has identified."

Macy, 897 F.3d at 756 (citing Spokeo, 136 S.Ct. at 1549). According to Beaudry, this case falls into the first Spokeo category because Congress created a cognizable intangible injury under the FCRA by giving consumers the right to enforce 15 U.S.C. § 1681e(b) to protect concrete interests—specifically, fairness and accuracy in credit reporting. (Doc. No. 268 at 12.) Thus, Beaudry argues, she does not need to allege any additional harm beyond TeleCheck's statutory violation to have standing. Defendants contend that this case falls into the second category and "an alleged statutory violation of the FCRA . . . alone is insufficient to confer standing in the Sixth Circuit." (Doc. No. 274 at 9–10.)

To resolve the parties' disagreement about whether TeleCheck's alleged FCRA violation "is sufficient in and of itself to constitute concrete injury," the Court must first decide whether "Congress conferred the procedural right to protect a plaintiff's concrete interests. . . ." Macy, 897 F.3d at 756 (citing Spokeo, 136 S.Ct. at 1549). According to Spokeo, the answer is a resounding yes because Congress's general goal in enacting the FCRA was to ensure accurate credit reporting by "curb[ing] the dissemination of false information." Spokeo, 136 S.Ct. at 1545, 1549. And the specific provision at issue here—15 U.S.C. § 1681e(b)—attempts to further protect those concrete interests by requiring consumer reporting agencies to "follow reasonable procedures to assure

12

maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

The Court's inquiry does not and cannot end there, however, because it must also decide whether "the [alleged] procedural violation presents a material risk of real harm to that concrete interest." Macy, 897 F.3d at 756 (citing Spokeo, 136 S.Ct. at 1549). The answer to this question is important because TeleCheck's alleged § 1681e(b) violation does not automatically give Beaudry standing to sue. For example, the Supreme Court in Spokeo held that "[a] violation of one of the FCRA's procedural requirements may result in no harm," such as when a company disseminates an incorrect zip code. 136 S.Ct. at 1550. On the other hand, some FCRA violations alone may be sufficiently concrete to confer standing. See Ramirez v. TransUnion LLC, 951 F.3d 1008, 1026 (9th Cir. 2020) (finding § 1681e(b) violation conferred standing because defendant "inaccurately identified and labeled all class members as potential terrorists, drug traffickers, and other threats to national security"); Robins v. Spokeo, Inc., 867 F.3d 1108, 1117 (9th Cir. 2017) (inaccurate information about plaintiff's age, marital status, education, and wealth published to third parties caused actual harm to his employment prospects).

Here, the Court finds that Beaudry's alleged "injury," namely, improperly being viewed as having a nonexistent or limited check-writing history in TeleCheck's internal database, did not present a material risk of real harm to the interests the FCRA was designed to prevent. As an initial matter, the FCRA was designed "to curb the *dissemination* of false information" in credit reports, Spokeo, 136 S.Ct. at 1550 (emphasis added), and Beaudry has not offered any evidence that TeleCheck published or disseminated her inaccurate information to a third party. But even assuming arguendo that TeleCheck did publish her false information, the record does not reflect that Beaudry experienced a single check decline or any credit-related inconveniences because of

13

TeleCheck's inaccurate internal data that did not link her driver's license numbers. At most, TeleCheck's inaccurate driver's license data created a meaningless risk of harm akin to an incorrect zip code, id. at 1550, rather than a substantial or severe risk of harm to Beaudry's concrete interest in avoiding the dissemination of inaccurate credit reports. At the end of the day, Beaudry's erroneous check-writing history "never made a difference in any credit determination, meaning its continued existence in TeleCheck's system did not harm [her] concrete economic interests." Huff, 923 F.3d at 467 (citing Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp., 879 F.3d 339, 345 (D.C. Cir. 2018)).

Having concluded that TeleCheck's alleged FCRA violation did not cause an actual or material risk of harm to Beaudry's concrete interests, the Court finds that Beaudry has alleged nothing more than a "bare procedural violation, divorced from any concrete harm." Spokeo, 136 S.Ct. at 1549; Huff, 923 F.3d at 465. That is not enough to survive summary judgment.

## IV. CONCLUSION

For the foregoing reasons, Beaudry has not carried her burden to show she suffered an injury-in-fact and therefore lacks standing to bring this lawsuit. Accordingly, Defendants' Renewed Motion for Summary Judgment for Lack of Standing (Doc. No. 260) will be granted, and this case will be dismissed without prejudice.[10]

An appropriate order will enter.

WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

[10] "Article III standing is jurisdictional, and . . . dismissal for lack of subject matter jurisdiction should normally be without prejudice." Thompson v. Love's Travel Stops & Country Stores, Inc., 748 F. App'x 6, 11 (6th Cir. 2018).